UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| ROBIN S. GOLAY, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-CV-28 PLC |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Deputy Commissioner of Operations, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Robin Golay seeks review of the decision of the Deputy Commissioner of Operations of the Social Security Administration (SSA) denying her application for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act.[1] Because the Court finds that remand is required for further consideration of the treating psychiatrist's opinion, the Court reverses the denial of Plaintiff's applications and remands the case for further proceedings.

### I.  *Background and Procedural History*

Plaintiff, who was born on April 27, 1968, filed applications for Disability Insurance Benefits and Supplemental Security Income alleging she was disabled as of September 1, 2012 as a result of: fatigue, obesity, scoliosis, rheumatoid arthritis, COPD, sleep apnea, depression, and learning disability. (Tr. 125-26, 243-251, 252-56). The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 125-35, 136-46, 159).

---

[1] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 13).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing in October 2014. (Tr. 52-103). At the hearing, Plaintiff testified that she was forty-six years old, 4' 8" tall, and 205 lbs. (Tr. 56, 58). Plaintiff attended special education classes from first through twelfth grade and obtained a high school diploma. (Tr. 61). In regard to her mental health, Plaintiff testified that she had been seeing Dr. Goldman, a psychiatrist, for about two years, and also saw a counselor once every two weeks. (Tr. 72-3). Plaintiff began seeing Dr. Goldman because she was: "Getting mad at everything and everybody, throwing things, depressed all the time, couldn't stand to be out in public with everybody, couldn't get along with anybody." (Tr. 73).

Plaintiff testified that she experienced crying spells "two or three times a day," during which she generally cried "[a]bout half an hour." ((Tr. 74). Plaintiff also experienced "two or three" panic attacks per day, when her heart "feels like it's going to come out of my chest. I get real dizzy" and her breathing "increases." (Tr. 75). Plaintiff stated her panic attacks generally lasted five to ten minutes. (Tr. 75). She was currently taking lorazepam for anxiety. (Id.). Plaintiff testified that she rarely left her house and spent most of her day on the couch. (Tr. 76-77). Plaintiff had suicidal thoughts and had made one suicide attempt. (Tr. 74).

Plaintiff stated that she had difficulty getting along with people at her last job at a senior citizen center. (Id.). Plaintiff explained, "[W]hen I was mad at [my boss], I'd throw dishes and stuff." (Id.). Plaintiff also raised her voice and "use[d] language [she] shouldn't use." (Tr. 74). Toward the end of her job at the senior center, Plaintiff missed "two, maybe three days a month" because "[m]y arthritis was flaring up, and my boss was getting to me." (Tr. 78).

In a decision dated November 18, 2014, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920 and found that Plaintiff had the severe impairments of

obesity, rheumatoid arthritis, mild COPD, and depression, and the nonsevere impairment of gastritis. (Tr. 11).

After reviewing the testimony, medical records and third-party function reports, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (Tr. 15). The ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform sedentary work with the following nonexertional limitations: "She can understand, remember, and carry out simple instructions consistent with unskilled work. She can tolerate occasional contact with co-workers and supervisors, but no contact with the general public." [2] (Tr. 13-14). Finally, the ALJ found that Plaintiff was unable to perform any past relevant work but, considering her "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform[.]" (Tr. 19).

Plaintiff requested review of the ALJ's decision by the SSA Appeals Council, which denied review. (Tr. 1-4, 5). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

---

[2] The ALJ also assessed the following exertional limitations:
> [T]he claimant can occasionally lift up to 10 pounds, and frequently lift or carry less than 10 pounds; stand or walk 2 hours out of an 8 hour workday and sit 6 hours out of an 8 workday, with a "sit-stand option" allowing a change in position every 30 to 60 minutes for a few minutes at a time while remaining at the work station. She can perform work that does not require climbing on ropes, ladders, or scaffolds, and no more than occasional climbing on ramps and stairs, balancing, stooping, kneeling, crouching, or crawling, and should avoid concentrated exposure to temperature extremes, wetness/humidity, vibration, and work hazards such as unprotected heights and being around dangerous moving machinery; and should avoid concentrated exposure to pulmonary irritants such as gas, fumes, odors, dust, and workspaces with poor ventilation.

(Tr. 13).

## II. Standard of Review

A court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

## III. Discussion

Plaintiff claims the ALJ erred in: (1) failing to assign the opinion of Plaintiff's treating psychiatrist, Dr. David Goldman, controlling weight; and (2) assessing an RFC that was not supported by substantial evidence. (ECF No. 18). Defendant counters that the ALJ properly:

(1) discredited Dr. Goldman's highly restrictive opinions because they were inconsistent with his treatment notes and the record as a whole; and (2) properly formulated Plaintiff's RFC.[3] (ECF No. 23).

*A. Treating physician opinion*

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Goldman, Plaintiff's long-term treating psychiatrist. Plaintiff further contends that the ALJ failed to provide "good reasons" for assigning Dr. Goldman's opinion less than controlling weight, as required by the SSA regulations. In response, Defendant asserts that the ALJ properly determined that Dr. Goldman's medical opinion was inconsistent with his treatment notes and the record as a whole.

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Id. (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)). See also Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole;

---

[3] Because the Court reverses on the ground that the ALJ erred in discrediting the opinion of Plaintiff's treating psychiatrist with minimal explanation, the Court need not address Plaintiff's second claim.

5

and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Goldman first evaluated Plaintiff at Mark Twain Behavior Health (MTBH) on October 15, 2012. (Tr. 534-36). She informed Dr. Goldman that she was seeking treatment to "get me out of this depressed mood and out of my mood swings." (Tr. 535). In his evaluation, Dr. Goldman described Plaintiff as "polite and cooperative" and "spontaneously conversant." (Tr. 534). Plaintiff maintained good eye contact, demonstrated "linear thought processes that were easily directed," and displayed no eccentricities of speech, psychomotor agitation, or psychomotor retardation. (Tr. 534). Dr. Goldman opined that Plaintiff's symptoms suggested "a bipolar disorder type II with occasional elevations of mood more congruent with a hypomania of an irritable type with recurrent major depressive episodes." (Tr. 535). Dr. Goldman diagnosed Plaintiff with bipolar disorder type II, assessed a GAF score of 45, and prescribed Abilify. (Tr. 536).

Plaintiff returned to Dr. Goldman's office one month later and reported that, she had "only cried twice" since starting the Abilify and her moods were not "surging as bad as" before. (Tr. 533). Dr. Goldman increased Plaintiff's Topamax. (Id.).

In January 2013, Plaintiff reported "good things and bad things," and Dr. Goldman noted Plaintiff's "good response" to medication. (Tr. 538). The following month, a Community Support Specialist (CSS) from MTBH visited Plaintiff at her home and noted that Plaintiff was struggling with "crying spells and feelings of isolation." (Tr. 545).

In March 2013, Plaintiff told her CSS that she was feeling "weepy and unable to control her emotions" and experiencing "fits of anger and aggression along with feelings of depression." (Tr. 543). When Plaintiff met with Dr. Goldman later that week, she informed him that she was experiencing mood swings – stating, "I put a chair through my oven door" – and believed the Topamax had lost its efficacy. (Tr. 540). Per Plaintiff's request, Dr. Goldman increased her Topamax dosage. In May 2013, Plaintiff informed her CSS that she "feels emotional and has crying spells but attributes these to relationship stressors." (Tr. 636).

When Plaintiff returned to Dr. Goldman's office in June 2013, she stated she was "[n]ot too bad, not too good." (ECF No. 577). Plaintiff explained she "may need something else [medication] because sometimes I take to spells where I get real angry." (Tr. 580). Plaintiff's mental status exam was normal, and Dr. Goldman assigned her a GAF score of 44. (Tr. 579). Dr. Goldman provided Plaintiff samples of Latuda. (Id.). In meetings with her CSS in July, August, and September 2013, Plaintiff reported no major issues with her mental illness or medications. (Tr. 645, 650, 656).

At Plaintiff's next appointment with Dr. Goldman in August 2013, she informed him that she was not "flying off the handle any more" and believed the "Latuda is helping quite a bit. . . . It's helping as far as keeping me calmed down and stuff." (Tr. 572). However, she reported continued difficulty in crowds and "issues with anxiety." (Id.). Dr. Goldman's treatment notes reveal that Plaintiff's mental status exam was normal and her GAF score was 44. (Tr. 573-75). Dr. Goldman continued her Latuda and Topamax. (Tr. 576).

In October 2013, Plaintiff informed her CSS that she was experiencing "major mood swings and lack of motivation." (Tr. 666). At her annual mental health assessment the same day, Plaintiff stated "I don't yell like I used to and I have calmed down a lot[.]" (Tr. 617).

7

However, she reported anxiety and "wanting to sleep all the time, not wanting to do anything in the house." (Tr. 619). The licensed professional counselor who evaluated Plaintiff noted the following symptoms: anxiety, decreased "energy activity level," excessive sleep, and poor concentration. (Tr. 619-20). Plaintiff also exhibited "push of speech," inability to concentrate, poor judgment, and flat affect, but normal flow and content of thought. (Tr. 621-22). Plaintiff's GAF score was 38. (Tr. 624).

At an appointment with Dr. Goldman in November 2013, Plaintiff reported a "good response" to the medication, but increasing anxiety and lack of motivation. (Tr. 566). Dr. Goldman noted a normal mental status exam and GAF score of 38. (Tr. 567-68). Dr. Goldman increased Plaintiff's Topamax and prescribed Ativan. (Tr. 570). In December 2013 and January 2014, Plaintiff informed her CSS that she was experiencing fatigue, lack of energy, depression, moodiness, and crying spells. (Tr. 675, 687)

In January 2014, Plaintiff informed Dr. Goldman that she was doing well with her medications and was "happy in one sense and not in another." (Tr. 560). Plaintiff's mental status exam was normal and her GAF score was 38. (Tr. 561-62). Dr. Goldman increased her dosage of Latuda. (Tr. 564). The following month, Plaintiff complained to Dr. Goldman that she feared the Latuda was causing her to weight gain but stated, "I hate to change it because I'm doing so well on it." (Tr. 554). Plaintiff's mental status exam was normal and her GAF score was 38. (Id.). Dr. Goldman discontinued Plaintiff's amitriptyline and Latuda and prescribed Saphris. (Tr. 559).

In March 2014, Plaintiff informed her CSS that counseling "has helped me out tremendously . . . I'm not as angry and people have told me that they have seen a big difference in me." (Tr. 582). Plaintiff continued to struggle with depression, anxiety, anger, and lack of

motivation, but attended church regularly and was "motivated to start participating in crafts again." (Tr. 587).

When Plaintiff returned to Dr. Goldman's office in April 2014, she reported that the Saphris was "no[t] good" and she had resumed taking Latuda and amitriptyline. (Tr. 548). Dr. Goldman noted a normal mental status exam and GAF score of 38. (Tr. 549-50). That month Plaintiff informed her CSS that she felt "somewhat overwhelmed and unable to control some of her emotions." (Tr. 706, 708). When Plaintiff saw her CSS in May 2014, she reported fatigue but denied feeling depressed or experiencing "anger outbursts or major mood swings." (Tr. 925).

Dr. Goldman completed a Medical Source Statement (MSS) for Plaintiff in June 2014. (Tr. 812-14). Dr. Goldman stated that Plaintiff was extremely limited in all work-related mental activities, including her ability to: understand and remember simple instructions; carry out simple instructions; and make judgments on simple work-related decisions. Dr. Goldman wrote:

> Patient suffers from Bipolar Disorder with predominant/recurrent depressive episodes. The patient's disorder adversely impacts her memory and concentration such that patient has difficulty remembering even simple instructions let alone being able to perform them. Patient is unable to make judgments due to her issues of depression and self-doubt. Patient also experiences explosive anger episodes which make focus and concentration difficult.

(Tr. 813).

In addition, Dr. Goldman stated that Plaintiff was extremely limited in her ability to: 1) interact appropriately with the public, supervisors, and co-workers; and 2) respond appropriately to usual work situations and changes in a routine work setting. (Id.). Dr. Goldman explained: "Patient experiences explosive anger episodes which make interactions with supervisors, coworkers, and the public very difficult and strained. . . . Patient easily becomes frustrated and

9

angry, with explosive outbursts." (Id.). He further opined that Plaintiff's physical impairments – namely, rheumatoid arthritis, osteoarthritis, scoliosis, and obstructive sleep apnea – affected her ability to concentrate and interact with others. (Id.). However, Dr. Goldman noted that Plaintifff was able to "manage benefits in [her] own interest." (Tr. 814).

Plaintiff's last recorded appointment occurred Dr. Goldman was in July 2014. (Tr. 1032). At that time, Plaintiff reported "feeling pretty good," but was having difficulty sleeping and experiencing "anxiety and discomfort going out in public." (Id.). Plaintiff also complained of low energy, stating, "I'm not wanting to do anything all day long. I can't get motivated in doing anything. . . . I hardly ever leave the house." (Id.). In the mental status exam, Dr. Goldman noted that Plaintiff's activity level and affect were "abnormal" and her GAF score was 38. (Tr. 1033). Dr. Goldman continued Plaintiff's current psychiatric medication regimen. (Tr. 1036).

In August 2014, Plaintiff expressed concern to her CSS that the Topamax was losing its efficacy and reported "severe lack of motivation lately." (Tr. 1018). Plaintiff also told her CSS that, "while she was camping over the weekend," she became frustrated and yelled obscenities at "a group of younger people." (Id.). A couple weeks later, Plaintiff told her CSS that, despite continued lack of motivation, she was "able to engage in some work in her garden by pulling weeds and trying to clean up the area." (Tr. 1023).

Dr. Goldman completed a second MSS for Plaintiff in September 2014. (Tr. 1059-61). Dr. Goldman reduced Plaintiff's limitation to "marked" in the area of understanding and remembering simple instructions, but again found that she was extremely limited in all other work-related mental activities. (Tr. 1059-60). Dr. Goldman explained:

> Due to patient's mood fluctuations with a predominant mood of depression, patient's ability to focus and concentrate, as well as patient's ability to

> remember, is greatly compromised. Patient also suffers from anxiety and is uncomfortable leaving her house. Patient becomes very anxious around other people. Because of the Bipolar Disorder and the Anxiety Disorder, the patient is unable to remember instructions either simple or complex and is unable to follow through or make decisions on them.

(Tr. 1060). In regard to interpersonal skills, Dr. Goldman explained: "[T]he patient has ease to anger and irritability that result in angry outbursts alienating others. The patient's anxiety disorder compounds the patient's inability to deal with the public, coworkers, and supervisors." (Id.). Again, Dr. Goldman opined that Plaintiff was able to "manage benefits in [her] own interest." (Tr. 1061).

In her decision, the ALJ acknowledged that Dr. Goldman was Plaintiff's treating psychiatrist and assigned Dr. Goldman's two MSS's, completed in June and September 2014, "little weight." (Tr. 18). The ALJ observed that Dr. Goldman found that Plaintiff "would have extreme limitations in all of the subcategories of functioning he assessed," including Plaintiff's ability to understand and carry out simple instructions and interact appropriately with coworkers, supervisors, and the public. (Id.). In regard to her decision to afford Dr. Goldman's opinion "little weight," the ALJ stated only: "Dr. Goldman's opinions are not generally consistent with the claimant's treatment records, which demonstrate mostly normal mental status examinations over time, and only minor symptomology." (Id.).

Under the framework provided by the regulations, Dr. Goldman's opinion was entitled to controlling weight. Dr. Goldman was Plaintiff's treating psychiatrist and was a specialist in the area upon which he rendered his opinion. It is also significant that Dr. Goldman treated Plaintiff every two months from October 2014 until July 2014. See 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical

opinion."). As Plaintiff's treating psychiatrist, Dr. Goldman was "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s)" and he "bring[s] a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations[.]" 20 C.F.R. § 404.1527(c)(2).

While the ALJ correctly observed that Dr. Goldman's treatment notes generally contained normal mental status examinations, she did not address the fact that Dr. Goldman consistently diagnosed Plaintiff with bipolar disorder type II and assigned her GAF scores of 45 or lower.[4] Dr. Goldman prescribed Plaintiff several psychotropic medications for her mental impairments and regularly adjusted the dosages, suggesting that her symptoms were not controlled. Although Plaintiff's anger and aggression improved with the introduction of Latuda, she continued to complain of mood swings, anxiety, crying spells, and lack of energy/motivation.

Furthermore, Dr. Goldman's medical opinion was consistent with observations made by Plaintiff's treating rheumatologist, Dr. Kinim Smith. Dr. Smith noted Plaintiff's "irritability," "depressed mood," and/or "fatigue/lack of energy" at appointments in: November 2011; March, April, June, and December 2012; September, November, and December 2013; and January, February, March, April, May, June, July, September, and October 2014. (Tr. 405, 409, 412, 420, 726, 729, 731, 776, 800, 803, 808, 810, 986, 1040, 1043 1064).

The progress notes of the two CSS's who regularly counseled Plaintiff also supported Dr. Goldman's medical opinion. Although Plaintiff's CSS's are not "acceptable medical sources"

---

[4] "The history of GAF scores at 50 or below, taken as a whole, indicate that [Plaintiff] has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning. . . ." Pates-Fire v. Astrue, 564 F.3d 935, 944 (8th Cir. 2009) (quoting DSM-IV at 32). See also Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (noting a GAF score of 50 reflects a serious limitation on a claimant's ability to perform basic life tasks; VE testified that an individual with a GAF score of 50 could not work).

under the regulations, their treatment notes may still be properly considered as other medical evidence as they are consistent with Dr. Goldman's opinion regarding Plaintiff's limitations. See, e.g., Wigfall v. Berryhill, 244 F.Supp.3d 952, 965-66 (E.D.Mo. 2017).

Additionally, the ALJ erred in discounting Dr. Goldman's opinion in favor of that offered by Dr. Jeffrey Harden, a consultative examiner. (Tr.17). Dr. Harden examined Plaintiff on a single occasion in May 2012, months before she began treatment with Dr. Goldman and over two years before the ALJ's October 2014 hearing. (Tr. 379). Nevertheless, the ALJ assigned "significant weight" to Dr. Harden's opinion that Plaintiff was either mildly limited or not limited in in her ability to perform all work-related mental activities. (Tr. 17). "As a general matter, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." Wigfall, 244 F.Supp.3d at 967 (quoting Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007)).

Finally, to the extent the ALJ discredited Dr. Goldman's opinion because records of Plaintiff's mental health treatment showed "overall good progress with treatment" (Tr. 19), the ALJ failed to "acknowledg[e] that [Plaintiff's] symptoms waxed and waned throughout the substantial period of treatment[.]" Nowling v. Colvin, 813 F.3d 1110, 1123 (8th Cir. 2016). "[D]oing well for the purpose of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001). In this case, the longitudinal picture of Plaintiff's mental impairment shows that she continued to exhibit symptoms of mental illness even through periods of regular treatment and improvement. An "improvement" in a patient with mental illness is not

necessarily inconsistent with a finding of disability.  See e.g., Frederick v. Berryhill, 247 F.Supp.3d 1014, 1034 (E.D. Mo. 2017).

## IV.  *Conclusion*

For the reasons stated above, the Court finds that the ALJ failed to properly weigh Dr. Goldman's opinions and thus failed to properly assess Plaintiff's disability claim such that substantial evidence does not support the ALJ's determination.  See, e.g., Gordon v. Astrue, 801 F.Supp.2d 846, 859 (E.D.Mo. 2011).  Defendant's decision is reversed and remanded for an appropriate analysis of the medical opinion evidence.

Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of July, 2018